Good morning ladies and gentlemen. First case for argument this morning is Ernst v. City of Chicago. Mr. Karsh. Good morning, Your Honors. My name is Joshua Karsh on behalf of the plaintiffs in this case. Throughout the 1980s and the 1990s, women and men as paramedics. By 2000, 25% of the paramedic workforce was female. Patrick Howe, who was the chief emergency medical services EMF field officer for the Chicago Fire Department, testified at the trial in this case and he confirmed that women and men consistently performed at the same level. There were no reports, and there is no evidence in this case of any difference in job performance between women and men. There is also no evidence that any patient's care or transfer has ever been delayed or jeopardized. Then, in 2000, for the first time, the city instituted physical testing for new hires. The city did not institute physical testing for its incumbent workforce, although paramedics' careers span decades. The city to this day does not mandate required physical testing for incumbents and never has. For incumbents, you say? For incumbents, correct. Yeah, well incumbents get older, right? They do. And heavier. They do, and if physical ability were a concern, you would think it might be especially so for incumbents as they got older and heavier. The city does not test them for physical ability. There is no mandated required physical testing for incumbents. Is there a mandatory retirement age? I don't know the answer to that question, but I do know from the data in this case that there are paramedics who continue past the age of 50. Until the year 2000, men and women applying for this position had an equal shot at getting it, but with the introduction of the physical performance test, what we're calling the PPT, the odds of employment for women for this position, which men and women had been performing side by side for decades with no observable difference in their performance, women's chances plummeted. Because of this test and only because of this test, suddenly women were being denied employment in this at a rate 20 times higher than men, although they had performed the job with men every bit as well as men for years. This gives rise to two overarching questions in this case. Why did the city do it? And did the city carry its burden of proof to demonstrate that this test was job related? This test had a severe and undisputed disparate impact. As a result, under very well established burden shifting framework of Title VII for disparate impact cases, the city started this trial with the burden of proof, not the plaintiffs. As the Supreme Court emphasized in Lewis v. City of Chicago, in a testing case like this, unless and until the employer proves a business necessity defense and job relatedness, quote, the plaintiff wins simply by showing disparate impact. That was the posture at the beginning of the trial here. The burden of proof was on the city to prove that there is a connection between candidate scores on this test and their subsequent job performance. Well, there was no question at the outset that there would be a disparate impact. Disparate impact was foreseeable, yes. So they were taking that into consideration, I thought, and trying to come up with some sort of a test. And obviously if 98% of the men passed the test, I don't want to be facetious, but it can't be too tough. And when the women, many fewer, I believe it was just under 60%, right? 40% of the women were denied employment because of this test. The day before this test, 100% of men and women passed. But the test is, the question in the test, is there a justification for denying employment to 40% when you have no demonstrated gain or benefit from this test? One of the remarkable things about the record in this case is there is no evidence that there was any improvement on any aspect of job performance after the introduction of this test. There is no evidence that job performance improved, that injury rates went down, that patient safety was affected. None. There's no evidence that there was a problem before this test except for Chief Stewart's hearsay notes. What we have here is a test that didn't address a problem, it created a problem. The day before the test, men and women compete for this job on an equal footing and there is no evidence that any patient safety was ever jeopardized or that performance was different between men and women. The day after the test, there's no evidence that there's an improvement. The only demonstrated result of this test in this record is that women get rejected for employment all of a sudden at 20 times the rate of men. That's a very high disparate impact under Title VII. The EEOC uses the four-fifths test. When you have women succeeding at 60% and men succeeding at 98%, you're way past four-fifths. Well, I don't know the basis for why the need and why they switched this around and they knew her name was Gebhardt. When I look at it, they just seem to say that the hiring of Gebhardt, they knew that she was, her history or whatever, I think she did one for the fire department overall, right? She had developed a physical abilities test for selecting firefighters. This one was for paramedics. That test also had a disparate impact. When they hired her, they knew they were going to get a disparate impact. That's where you talk about the intentional thing or at least the first part about treatment. That is part of the intent case. That is not the only evidence of intent here, but that is part of it, which is if you have a result in hand from your past experience and you decide to develop a new test using the same test developer who's told you she's going to give you the same approach and the same results, there's a logical inference that you did that because of the results and not merely in spite of them, that that's what you intended and a properly instructed jury in this case should have been allowed to draw that inference. Now, however it is initiated, because when we look at something after the fact, and this is a big policy thing with the city, is there something that is nefarious about it? Is there somebody that just has wrong information that they came up with this? Are there only a certain number of positions for the EMT? There are a capped number of positions. The city does not. So it's something that is limited. It is a fixed number of positions that men and women will compete for. The more men you hire, the fewer women you hire. And so that's at least one of the reasons why you'd say their treatment is to get more men because somebody said that's safer or something. Well, the city gave only one reason. This case is an 08 case. My clients took the test in 2004. The test was instituted in 2000. We had the trial in 2014. By the time we had trial, there was 14 years of history. There was nine years of data from this test. If this test was good at something, if it improved anything for the fire department, they had nine years of test data and 14 years of subsequent candidates' performance on the test that was praiseworthy, that would justify the disparate impact. They showed nothing. There is no evidence in this case that any aspect of patient safety or job performance improved at all. What's the ratio today? Or do you know? What's the ratio of men and women today? It's about exactly where it was in 2000, which gives rise to an inference that that's where they wanted to stay and that's why they did this. Now the city's on the disparate treatment, so there's no demonstrated gain or benefit from this test, and that's very compelling evidence. There are lots of evidence of intent to do so. The city had alternatives. The city could test for physical abilities and not do it this way. For instance, if your concern is whether your new hires are strong enough to lift a patient on a stretcher, put a dummy on a stretcher and ask the candidates to lift it and see if they can do it. You can test that skill very correctly. Would that be okay? I think that would be okay. When you do it that way, you don't have to have representative samples or statistical inferences or anything else because there's no inferential leap. You are testing exactly what you say candidates must be able to do. What if they did that testing your way and they still came up with this disparity? Then we would have a very different case, and what we would be talking about is whether they correctly determined how much weight has to be lifted to perform the job. But here, there's no such test. Remember, this test has three events. The first one, you're pedaling a bicycle with your arms. We had a whole parade of working paramedics who testified at this trial. To a person, everyone who was asked the question said, there are three events on this test, and we don't do any of them on the job, and they don't look like anything we do on the job. So there's pedaling a bicycle with your arms. Nobody does this motion when they're attending to a patient. Then there is a second event where you have an immovable bar that you hold between your legs. That's called a static lift. If you go like this with the stretcher and it doesn't move upwards with you, you've got a real problem. The whole purpose is to move the stretcher. That's not something anybody ever does on the job. The third event, and there is a video of the test in the record, which I encourage you to look at. The third event was a step platform. It's got two steps going up and two steps going down, and you cross back and forth as many times as you can in a set period, and they count your crosses, and then they say, we're not going to count any cross where you didn't touch both feet on the ground before you turned around and went back. All the paramedics said, that's not what we do either. That's not a flight of stairs. Is that an endurance test or agility? Or do you know? It's probably a test of cardiovascular fitness. But that's not what they said it was. They said it was a strength test. It wasn't that. Their expert got it wrong, and the evidence on that is quite clear and undisputed. The women did about equal on that one, didn't they? Men and women did fairly, they didn't do equal, but that is the test that gave the smallest difference. Everybody walks up and down the stairs, so I guess that's why they knew how to do that. Everybody does, but here's the catch. That was the score that got multiplied by 7. On average, women crossed that step platform 13 less times than men did on the test. If there were just a 13 point spread, that would not have handicapped anybody too terribly. But that's the one they multiplied by 7. When you multiply 13 by 7, suddenly you've got a 91 point spread. And now the gap in performance between men and women on that test is every bit as great as on the other two events. And that's a real problem. So we've got a test, it doesn't address any known problem, and it doesn't provide any known benefit. The city says, we did it to reduce injuries. And that explanation is difficult to fathom for two reasons. First of all, a properly instructed jury could draw all of these inferences. First of all, if your concern is injuries, there are a whole series of steps that you would have taken before, during, and after this test that the city never took. You'd gather evidence about what the injuries were and why they were occurring and how frequent they were. You'd send that evidence to your test developer. You'd ask your test developer to devise a test that specifically addressed the kinds of injuries that you were experiencing so that the test would screen people either for resistance to those injuries or for predisposition to them, one way or the other. And then after you gave the test, you'd gather your data and see whether the test had gotten any good, had it reduced injuries. And the evidence in this case is that the city did none of those things. Now there's a second problem, Your Honor, and it goes, Judge Manning, to your point about the 98% of the men passing. If your goal is to reduce injuries and three-quarters of your workforce is male and you want to reduce injuries by giving a test that 98% of the men pass, unless the only paramedics getting injured on the job are women, your test can scarcely help. How? Because you're not screening out any men. You're only screening out women. There's no evidence that only women were getting injured here. From all of these facts. What about the jury instruction? The jury instruction was seriously flawed. The jury instruction told this jury that you cannot, and this is the way the city argued it in closing, too, and it's the way the city argued for the instruction when it urged it, you cannot rule for the plaintiffs in this case because there is no evidence that a man with a score below 90-35 was hired. That's an improper instruction in a challenge to a facially neutral practice. Let's say, and this is only a slight variation on the actual facts in this case, the city had an expressive mission. We are going to adopt a test. That test is going to reject or flunk 40% of the women who take it, and they knew that roughly when they started. You knew that because you're saying that's why they hired Gephardt? It might be. A jury could infer it. I assume that's why it survives summary judgment because of some question there. Well, it survives summary judgment not only because the evidence of that's why they hired Gephardt, but there are two other major categories of evidence. One is how fishy the explanation was. Remember, this is not a case where the employer decided to take the Fifth Amendment and put the plaintiffs to their burden of proof. You tell us what our intent was. The city volunteered its intent. The city said our intent in devising this test was to address injuries, but that didn't make sense, and it was fishy enough, that explanation, given that 98% of men passed and there was no evidence that only women were getting injured, and because they didn't do any of the things that you would expect them to do if you were gathering evidence of injuries. The jury could say that's pretext, but in addition, the city had less discriminatory alternatives here. Dr. Gephardt gave them very specific alternatives. The city refused to adopt them, and then on top of that, the city said not only are we going to refuse to adopt them, we're not going to tell you why not. Now, that's a serious recalcitrance. I'm sorry. You're talking about the options? Yes. You know, they gave you three or four ways they could prepare? Right. And all they did, they sent the brochure. Correct. Which wasn't enough. You thought that, okay, what if they had advance warning, how to get in shape or whatever you do, go up and down the stairs and all that kind of thing. So that would have been better, I guess. That would have been better, but those set of facts go both to disparate impact and to disparate treatment. You understand you're in your rebuttal. Yes. They are dispositive of disparate impact because there are lesser discriminatory alternatives that were presented to the city and the city refused to use, but they are also relevant to disparate treatment to the intent case because when you have an employer who has alternatives, refuses to use them, and refuses to explain why on top of that, that's serious recalcitrance. And in that context, a reasonable jury properly instructed could find they had it, they wouldn't fix it, they won't even tell us why they wouldn't fix it. They must have intended it. They're not doing it in spite of the disparate impact, they're doing it because of it. I'm going to reserve the remainder of my time for rebuttal. Thank you. Thank you, Counsel. Ms. Luce. Good morning, Your Honor. May it please the court. I'm Susanna Luce. I represent the city of Chicago. In 2000, the city began using a physical abilities test to help ensure that Chicago Fire Department paramedics meet the physical demands of being a paramedic. The job is, without question, physically demanding, involving constant lifting and carrying of equipment and patients of all sizes up and down the stairs with all kinds of obstacles and in all kinds of circumstances. Ensuring that paramedics can handle the physical demands of the jobs is crucial to public safety. The plaintiffs are five women who did not pass the test in 2004, and they brought two challenges under Title VII, disparate treatment and disparate impact. And this morning I'll explain that judgment was proper on both of those claims. With respect to the disparate treatment claim, judgment on plaintiff's disparate treatment claims should be affirmed because there's no evidence that the physical abilities test was adopted for the purpose of excluding women. So the plaintiff's jury instruction that was tailored to that theory was properly rejected. The evidence here shows that city officials and HBS, the contractor who was hired to develop the test, were focused on the predictability of the physical abilities test and were concerned with public safety and also with adverse impact, and they made decisions along the way to minimize it when they could. With the jury instruction, it's almost right to the level of directed verdict, isn't it? Well, we do also submit that judgment was, we were entitled to judgment as a matter of law. We do not believe this theory of discrimination should go to the jury at all. Well, you think it's harmless error? Is it harmless error that... I mean, you're defending the instruction, or you just think that doesn't matter because there's no evidence anyway? We're defending the instruction, but this does go hand-in-hand with our argument that we're entitled to judgment as a matter of law. The jury instruction was improper because we submit there was no evidence to support that theory of intentional discrimination in the adoption of the physical abilities test. Well, do I say it? Obviously, you probably weren't around when this was, I don't know, when was this tried anyway? I don't know what that 14-year span that we have here, what went on all over the time. But as I understand it, they mentioned that a lot, as far as if a man, would a man get the job that a woman wouldn't? Right. And is that the test? Which, of course, when 98% of the men pass the thing, it's pretty obvious that somebody who flunks the test isn't going to, a man who flunks the test isn't going to get a job. That's correct. A man who flunks the test will not get the job. But they say that you'd have to show that a man would have gotten the job. That's correct. Yeah, that's pretty tough. We submit that's a typical instruction given. The magistrate judge was pretty critical of that, right? The magistrate judge was, but it was our position that, you know, under plaintiff's theory, they didn't have evidence to support a theory of intentional discrimination in the adoption of the physical abilities test itself, so they weren't entitled to an instruction that was tailored to that theory. And if I can explain why, in our view, plaintiffs rely essentially on, we heard it here this morning, they rely essentially on the fact of adverse impact to support their intentional discrimination claim. It's repackaged in several ways. They argue that the city hired an expert who had developed other tests that had an adverse impact, and they argue that the city knew in 2004 that this test was likely to have an adverse impact because it had in 2000 and 2001 when it was administered. But all this shows is knowledge that an adverse impact is likely, and that is not enough. And it's not enough because the city is allowed to use a physical abilities test, even with an adverse impact, if it is job related. And also besides that here, the adverse impact was clearly a concern to the city. It was never the point of the test. And what I heard here today about whether or not the city showed afterwards that this had the effect that the city wanted. Well, here you could validate a study that way, but we validated our test as we were supposed to before we implemented it. We did a detailed study to show that the physical abilities test is job related and does predict successful job performance. Well, that makes sense. Obviously, I know at one point somebody compared it to someone who was previously an EMT at some lesser demanding area. I don't know, three or four calls a day, whereas in this, what do you get, 18 or 20 calls a day? Up to 24 even. 24, okay. I mean, so there is at least some distinction there as far as why somebody may have to be higher physically able. Yes. I think going in, everybody knew there was going to be a disparate impact. I think that's almost a given. It is a given. Dr. Gebhardt, there is testimony in the record at an early committee meeting. She acknowledged there was going to be some. There was an expression that that was going to be a concern. Women often don't perform as well on these exams, but there are things you can do along the way to try to reduce adverse impact, and the city was focused on these at several points during this process. And we also do have the testimony of Chief Stewart, who did give a neutral reason for initiating the test, that paramedics were being injured before even completing the academy. And Dr. Gebhardt confirmed in her proposal that reducing workplace injuries was one of the benefits that a physical abilities test can have based on other studies that she had done. The plaintiffs have presented no evidence to show that there were, in fact, there weren't any workplace injuries, much less that. No evidence of what? Say that again. They show no evidence of what? That, in fact, there were no injuries in the academy, as Chief Stewart testified to. Plaintiffs deduce no evidence to show that this wasn't a true situation and wasn't his true reason and true motivation. They just said they wanted to avoid injuries, and they're saying, well, there was no proof that before all of this there were injuries. Is that what they're saying, there were no injuries? Or it's not a real issue? Chief Stewart said there were injuries, and they offered no evidence to show that it wasn't true. He was the head, he was the director of personnel, and he was over the medical section, and he had been receiving reports that there were injuries from paramedics even before they completed the academy. That was a concern of his. He brought it to his superiors, and that was what initiated the discussion about the physical abilities test. But besides that, injuries or not, the city is entitled to test for physical abilities that no one disputes are necessary for the job. Physical ability tests are now common for jobs that have clearly physical components to them, as the paramedic job does. Was this at the outset for those at entry level, the new hires? This was a test for new hires, yes. Is that test confined to the new hires? This test has been confined to the new hires. If they complain and say, well, what, after 10 years, 15 years, you know, I don't say it facetiously, but people get older and heavier or less conditioned and all that sort of thing. Well, I mean, that is a separate problem. I would note that there is a Chicago Fire Department general order that does require paramedics to maintain themselves and physically and mentally fit to perform any and all normally assigned duties at all times. So they have an annual test? They do not have an additional test beyond the entry level test, but it nevertheless is important for all paramedics. Well, I don't know. Obviously, I know it's not like a joke about it, but, you know, sometimes a lot of you see police officers who are older that you wouldn't want to see in a chase, so to speak. Some of us. I understand. Of course, if anything, that would support an additional physical abilities test. It certainly wouldn't undermine the use of this one in this case. I know this isn't a joking matter, but you still look at it, you're really trying to get, I assume, the best people. That's why I wondered if there is a cap on how many you hire. And then the question is, is there going to be a quota? Because it's obvious in a strength test and conditioning test except, you know, I had two daughters who were athletes, and I know the difference between male and female when it comes to that stuff. They may be really good against each other, but they're not going to beat the guys. Well, do you mean is there a cap or a quota on women in hiring? I don't know. I assume there's got to be vacancies, and then you fill them. And we put them on an eligibility list. So there's a list, kind of like we've gone through with the police and fire over a lot of times. As my opposing counsel mentioned, the actual percentage of women in the job of paramedics in the fire department hasn't decreased as a result of this. Hasn't changed, you mean? Anything that's gone a little bit up, but it's about the same. Is it still three to one or something like that? It's 30% women. Okay, but it's maintained that level? Up or down a percentage point, yes, during the period. And by doing that, there's a lot of, I assume occasionally some men, but a lot of women who don't make the grade. I assume a lot of people compete for these jobs. A lot of people compete for these jobs. And so you're looking to get the best for these jobs. We do. We're looking for those who can, well, actually this gets me to the discussion of the cutoff score. What we're looking for are the candidates who can handle the minimum expectations for satisfactory performance in the job. And that's what this test is designed to identify. What did you say? I didn't hear that last. We're looking for candidates who can handle the job satisfactorily. We don't do rank order, in other words. And that's another decision that was made along the way that was designed to guard against additional adverse impact on women. So we don't take the top score and go down. I'll ask you the same question I did to your opponent. Is there a mandatory retirement age? There is not for paramedics. Firemen, police, both have. Or at least police do, I know. I'm not sure that the paramedics would, I haven't done the analysis, I'm not sure they would fit within the same exception that allows for that. Well, there are shifts in jobs. I assume the paramedic has, there's not a variation. I mean, if you're a police officer, you can, I don't want to put it in, diminish it, but it's a desk job or certain areas of patrolling and other things that are less demanding, I assume. But this is continuing the same demand from day one, is it not? Pretty much as far as I know. There are some, of course, who move into the ranks of a firefighter paramedic, but pretty much this is the same job for all paramedics. Well, I still go back to that intent and treatment with that instruction. It just seems that that ruptures that part of the case. Well, I understand that, and our reason for opposing that instruction is because there's just absolutely no evidence to suggest. This, of course, was an intentional, this component of the test, there's disparate treatment and disparate impact. In the disparate treatment case, the plaintiffs had the burden to prove that this test was adopted for the purpose of excluding women, and there's just no evidence of that. We've already discussed adverse impact alone is not enough. Well, there's enough to avoid summary judgment, at least. Well, we lost that summary judgment. We oppose that, but we nevertheless submit that we were entitled to judgment as a matter of law on this. We've taken the position all along that there's not enough evidence on this. Well, if they just argue that hiring Gebhardt, knowing that she divides by looking at who's, you know, they may have. Their theory is that. I can understand that. With statistics and a lot of other things about disparate impact, that was inevitable, but I'm wondering just about the intent and then arguing that instruction, that the only way you can show that is by showing that a man with the same score would have been hired. That's a pretty tough test. And plaintiffs not entitled to a different instruction because they didn't show any evidence from which you could infer intentional discrimination. I want to get to your point about Dr. Gebhardt and their reliance on her. We hired her because she's the preeminent authority in physical abilities testing. So, yes, she's a little bit honest. I mean, she's very honest when she says some of these tests are going to have an adverse impact on women. But the fact that we hired an expert who had made tests that have an adverse impact, notably when she developed physical abilities tests for the Chicago Fire Department, those are supported by their own validity studies. The mere fact that we hired someone that had developed a test with an intentional basis to infer intentional discrimination when adverse impact alone in that test as well would be not enough to infer discrimination in the firefighter's test, for example. So, really, this is all just layering. Adverse impact alone is not enough to infer intentional. That's well settled. I think even plaintiffs would agree. And you really can't infer more than that from the fact that Dr. Gebhardt had produced other tests with an adverse impact. And beyond that, we have Dr. Gebhardt's study here. It was very thorough. It's full of thorough job analysis, statistical analysis, testing that was done. And it was on the strength of this report that the city followed these recommendations. And there's no hint of discriminatory animus towards women in that entire process. And briefly with respect to the plaintiffs referred to our reliance on her recommendations or her suggestions for reducing impact. And it's not really a fair characterization of what happened. She proposed three, what she called, optional implementation products which could help reduce impact. And the city selected one of the three. She did not recommend one over the other or say that one would be better than the other. We picked one on her suggestion that it could reduce adverse impact. It's hard for me to see how intentional. Is that the memo or whatever you call it? The third, what was the option you took? The brochure. The brochure that described. These were all sort of geared towards the same thing, informing candidates. Brochure requires somebody to read it and then do whatever it says to do and all that sort of thing. Absolutely. In the same way that a video requires someone to watch it or a training program requires someone to show up and take an active role in it. We chose a brochure. Whatever can be said, we actually followed one of her suggestions. It's beyond me how an intentional discrimination, an intent to discriminate against women can be inferred from that process. Well, back to that intentional thing. The magistrate judge put together an instruction, different than the one that was given, suggesting an instruction that had, I don't know, I'm going to ask you, what do you think of that instruction? We think that instruction would have allowed the jury to decide the question whether there was intentional discrimination against women in the adoption of the physical abilities test. And our position was there was no evidence of that, and so the jury was not entitled to decide that theory of the case. It's utterly unsupported by the evidence. So the instruction you gave was the one I've been sort of wondering about, where it said you'd have to show that a man would have been hired when a woman wouldn't have been under that low score. That is the pattern instruction, and that is the one that is typically given. It's a pattern, but it doesn't seem to fit the pattern here. I understand that it doesn't fit the pattern. Our position is that they weren't entitled to an instruction that didn't fit the pattern, that was tailored to their theory of the case because they didn't have evidence. You always have to show evidence to support an alternative instruction, and they did not have that. And the judge allowed the case to go to the jury on the pattern instruction, and if you look at his comments, he was concerned about some of the evidence that the plaintiffs had adduced with respect to their own individual circumstances in test administration, that they were interrupted and other things that happened during test administration. So that was the question that the judge allowed to go to the jury. I understand that isn't what plaintiffs identified as the crux of their claim, but that is what was allowed under the jury instruction that was given. The alternative instruction was not, our position is that it was not allowed because they just simply weren't allowed to take that theory to the jury on this record. Simply because there's no evidence, as you see it. That's correct. No evidence of intentional discrimination, from which the jury can infer intentional discrimination based on purely adverse impact. And let's see, with respect to disparate impact, we submit that the city met its burden of showing that the physical abilities test was job-related and consistent with business necessity. The city hired a renowned expert in the field with 35 years of experience, hundreds of physical abilities tests from the private industry to the military to public safety positions, including paramedics. She conducted a thorough study with the complete job analysis, testing, and statistical evidence needed to show that the physical abilities test was job-related and consistent with business necessity. The sample of incumbents was representative. It was made up of candidates normally available in the relevant labor market. And the cutoff score, too, was set in a way that was consistent, was job-related and consistent with business necessity. The cutoff score must be reasonable and consistent with normal expectations of acceptable proficiency in the workforce. And here the score was selected based on Dr. Gebhardt's utility analysis, which identifies scores corresponding to minimal acceptable levels of performance. Based on her analysis of the physical abilities test scores and the job performance scores, she indicated, I see that, I see I have a few more minutes. That utility analysis indicates that at the cutoff selected, which was 935, 92% of those who perform above that score would perform satisfactorily while under 935, 85% would perform unsatisfactorily. And she relied on standard deviation to set that score. That was a benchmark for acceptable performance. That is standard, a conventional way of assessing a cutoff score to see who is performing below the typical range for paramedics. And ultimately the city selected the score that all incumbents would pass, and that's not unlike the cutoff that was approved of in Evans when this court suggested that a rational way of scoring the firefighters' test would have been to take the maximum time in which a firefighter would take the test and make that the cutoff. There the maximum score was the worst score, and we submit that's essentially the same thing that the city ultimately did here. If there are no further questions, we do ask that the judgments of the district court be affirmed. I don't believe so. Thank you very much, Counselor. We are seeking a new trial on the intent claim because of the flawed jury instruction. In addition, we are also seeking reversal of the disparate impact judgment, and the recourse for the disparate impact, the errors in disparate impact analysis, should not be a remand. It should be a reversal and entry of judgment in plaintiff's favor because the city had the burden of proof and did not carry it, and the appellate remedy when a party has not carried the burden of proof is not a remand for a second bite at the apple. It's you didn't carry your burden of proof, you bore it, and here's why the city didn't carry its burden of proof. Several reasons. First, you cannot as an employer prevail in a disparate impact case under Title VII without showing job relatedness. Job relatedness is the bedrock requirement for disparate impact. You must show in a testing case that the results on your test are demonstrably related to some qualitative improvement in job performance. You've heard none of that this morning. Cities Council, in its briefs, in its argument, there is no demonstration that success on this test results in improved job performance. Second, they chose to defend this test and to try to validate it by statistics. That is not the only way to validate a test, but it is the way they chose to do it. When you use statistics to validate a test, and they do not dispute this, their entire job relatedness defense depended exclusively on statistics. When you do that, you must follow the laws of statistics. Job performance since that time. I guess you're referring to job performance before they did the test? Job performance before, but what you must do with your statistics is you must draw your statistics from a representative sample. This court has been repeatedly clear about that. In DeKoven v. Plaza Associates, in Espenscheid v. Direkstat, in Chavez v. Illinois State Police, in United States v. Johnson, the Supreme Court has made the same point in Abemaro. If you start with trash, you wind up with trash. Trash in, trash out. You must start with a representative sample in order to use inferential statistics. That includes people that have been there a while? That means when you draw your incumbents who've been there for a while, it's not enough to say we got African Americans, whites, men, and women. Because what you're measuring is physical ability. That would be like taking a political poll and saying, I got a lot of men and I got a lot of women, without looking at whether you got both Democrats and Republicans. That's the essence of what they did here. They got a bunch of superstar physical performers, who Dr. Gephardt said were among the best she had ever tested in any setting, private or public, for public safety positions or otherwise. Then they set the passing score on the basis of the performance of these straight A students. You can't do that. No case has ever allowed that. The second very important point is that because of job relatedness, what you must correlate is performance on the test to an actual measure of job performance. What they did here was take performance on the physical performance test and compare it to scores on a second set of tests, the work sample. The Second Circuit's decision in Guardian says correctly you cannot do that. You're also out of time. I will sit down. Thank you. Thank you, counsel. Thanks to both counsel, the case will be taken under advisement.